## AH HEE *v.* CRIPPEN.

THE sixty-fourth section of the Revenue Act of 1860, which declares that no person who is not a citizen of the United States, or who has not previously declared his intention to become such (Californian Indians excepted) shall be allowed "to take gold from the mines of this State, or hold a mining claim therein," without a license as provided in the Act, does not refer to mines contained in lands which are the property of individuals, but simply to mines in the public lands of the State or the United States.

The patent of the Mariposa estate from the United States issued to Fremont upon confirmation of a grant from the former Mexican Government, invested the patentee with the ownership of the precious metals which the land contains; it transferred to the patentee all interests which the United States possessed in

the soil and everything included therein or connected therewith, and the rights of the owners (Fremont and parties who have become interested with him) in that respect cannot be enlarged or diminished by any license from the State. They hold the mining claims in the land independent of this section of the Revenue Act named, and may extract the gold themselves, or allow others to extract it, upon such terms as they may judge most advantageous to their interests.

This limitation of the general language of the sixty-fourth section of the Revenue Act of 1860, shown to have been the sense of the Legislature in previous acts.

APPEAL from the Fifteenth District.

Replevin for a horse levied on by the defendant as Tax Collector of Mariposa county to enforce the collection of the foreign miners license of four dollars per month under the Revenue Act of 1860 ; plaintiff, who is a Chinaman, but a *bona fide* resident of the State, having refused to pay such license.

Judgment for plaintiff.    Defendant appeals.

*Thos. H. Williams, Attorney General,* for Appellant.

The Act of 1860 is not an act to authorize a trespass upon public or private land, but a license fee " in the nature of a fee of a specific sum exacted for licenses to sell certain goods or liquors, or to exercise certain trades, or to exhibit some curiosity, or for admission to certain privileges, or as a toll for the enjoyment of certain facilities," etc.    (*People* v. *Naglee,* 1 Cal. 244, 253, 254 ; *Vide* Stat. 1860, 390, sec. 65, for the form and nature of the license.)

It has been urged that the act only applies to the working of mines upon public land.    The language of the act, however, does not bear that construction.    The expression is, " take gold from the mines of *this* State."    It cannot be meant by that expression " the mines *belonging* to this State," for that would make the act self-destructive, because the State does not own any gold mines.    They all belong to the owner of the land, and all the mineral land within the State is owned either by the general Government or private parties.    It must therefore mean " the mines *within* this State." No other construction can make the act operative.

If, then, " the mines within this State " is the proper reading of the act, it follows that all mines are embraced, whether upon public or private land.    There is no exemption either by the terms or the

Ah Hee *v.* Crippen.

spirit of the act.   The only question, then, arising is, whether the Legislature has the power to compel a person to pay a license for the exercise of the occupation of gold mining upon his own lands, or upon the land of another by consent of the owner.   It would seem that argument upon this proposition is useless.   Courts have in case after case upheld tax laws requiring persons to pay a license tax for the exercise of trades, professions and occupations in their own houses or upon their own premises.   The right to do so has been maintained in several decisions by this Court, and in the case of *People* v. *Naglee* cited above, the foreign miners tax law was sustained upon precisely the same principles.   There can be no difference in the principle between a law compelling a tax for keeping a hotel or livery stable, and a law requiring a tax for the exercise of the occupation of a miner; and whether the trade is exercised in or upon rented property, or the property of the individual taxed, is immaterial, so far as concerns the solution of the legal proposition of the power to levy and collect the tax.

In *The People* v. *Naglee*, this Court held that the State has the power to tax persons for mining upon the lands of the United States. The same principles apply to the lands of private parties.   There is no distinction as to the rights of individuals and corporations in the protection and enjoyment of property, nor between those of a political corporation and corporations for other purposes.   If there is any distinction under our system between the rights of the General Government and private parties within this State, relative to lands of which they are respectively proprietors, the advantage is in favor of the former.   The lands of the former are exempt from taxation.   To hold that the State has not the power to tax miners working upon private lands for the exercise of their occupations, is also to establish that she cannot tax for operating upon the lands of the General Government.   Such a doctrine would put an end to all taxes of the character under consideration, and turn loose upon the mines the Asiatic hordes within our midst, with full license to exhaust the most valuable resources of the country, without giving anything in return.

*C. T. Botts*, for Respondent.

I.   If the Act of 1860, imposing a tax upon foreign miners, does in its terms extend to the case of the respondent, it is to that extent unconstitutional and void.

The respondent is a foreigner and a *bona fide* resident of the State of California; the lands upon which he is mining he holds by lease from John C. Fremont and others, the admitted owners.   The respondent, therefore, claims the benefit of the seventeenth section of the first article of the Constitution of California, which secures to him " the same rights, in respect to the possession, enjoyment and inheritance of property," as to a native born citizen.   Can a native born citizen be subjected to a special tax upon the product or yield of his leasehold estate ?   The Constitution, in its limitation upon the power of the Legislature to raise revenue, or in other words to levy taxes, declares (Art. XI, sec. 13) that " taxation shall be equal and uniform," and that " all property in this State shall be taxed in proportion to its value."   The Legislature, then, in levying taxes, can make no distinction for or against any lawful calling, or between different kinds of legally acquired property.

Public revenue is the property of individuals transferred to the public treasury.   All revenue, then, must accrue from assessments on property, and this whether it is obtained under the particular form of licenses, or the more ordinary mode of taxation.   That is to say, the farmer's property is " taxed," whether an assessment is laid upon his property in the general or upon the proceeds of his land, or whether it comes in the shape of a license to dig or culti-vate his grounds.   It is an idle distinction to say, that in the first case Government compels the payment of the assessment, and in the two last by idleness he may avoid the payment of the tax.   It would be as reasonable to say that the tax upon a house is volun-tarily paid, because the owner might have avoided it by burning the building.   Taxation is the generic term which includes any and every mode by which the property of the citizen is turned into the public coffers.   The word " taxation " is thus used in the Constitu-tion.   Its framers say, revenue is nothing but the fruits of taxes levied upon property; every man is entitled to be secured in the fruits of his labor, or in other words, his property, whether it con-sist of what are called luxuries, or whether it be confined to what

are usually denominated the necessaries of life.   There shall be only one mode of measuring taxation.   As the chief object of government is to protect property, and as all kinds of property are alike protected, property should contribute to the support of government in an exact ratio to the protection it receives; that is, in exact proportion to its value.   All this is effected by the simple provisions of the thirteenth section of article eleven: " Taxation shall be equal and uniform," and " all property in this State shall be taxed in proportion to its value."

If, then, revenue can be derived only by converting private into public property, and if the Legislature in such conversion be limited to an uniform and *pro rata* assessment, it follows that any special assessment, whether upon an individual or upon a class, would be unconstitutional, illegal and void, and we think that this protection against special and individual oppression extends equally to *bona fide* resident foreigners as to native born citizens.

The Attorney General attempts to oppose these views, not upon any system of *a priori* reasoning, but upon the views of this Court as expressed in the case of *The People* v. *Naglee* (1 Cal. 232). So far from admitting that this case is against him, it is to this very authority that the respondent would refer to sustain, by implication at least, the position for which he contends.   That was a case, virtually, in which foreigners neither *bona fide* residents, nor with any legal interest in the land upon which they were mining, questioned the validity of the law imposing a tax upon foreign miners.   It might be sufficient to remark, that in these two important requisites of residence and interest, the case at bar is the antipodes of the sole case cited and relied on by the Attorney General.   But the respondent proposes to go farther, and to show, not only that the lack of these features was the ground of the decision in that case, but that the Court more than intimated that their existence would have led to a different result.   Thus the Court in one place said: " The party to complain is the owner of the land, or some individual holding under such an owner.   The State is not the steward or bailiff of the General Government, having in charge the protection or security of the public property."   (See 1 Cal. 244.)   And again, at page two hundred and fifty-one: " The appellant contends that

the act is void under the seventeenth section of the first article of the Constitution.  *  *  Here again the ground upon which an argument against the statute could be based appears to be wanting. The complaint does not charge that the foreigners from whom the respondent has exacted the license fees had become or were *bona fide* residents of this State, and although foreigners, unless they were *such* residents, neither they nor the Attorney General on their behalf can avail themselves of this clause of the Constitution. Again : it is not alleged that they had any property in the possession, enjoyment or inheritance of which they were molested.  On the contrary, the burden of the appellant's argument is that they have been prevented by this act from availing themselves of the wealth of the public mineral lands of the United States.  It is difficult to perceive how they could have any *property* in these lands to enjoy, possess or inherit, and unless they had, this section of the State Constitution could not apply." To bring themselves, says the Court, within the protection of the constitutional provision, these foreigners must show that they are *bona fide* residents, and possess an interest in the land upon which they are mining.  The respondent fills both these requirements ; he is a *bona fide* resident of the State, and a leaseholder of the land upon which he is mining.  Although the case of the respondent was not before the Court in 1850, it seems to have been anticipated and to have been virtually decided in his favor.

II.    The statute was intended to apply only to the public lands of the United States.  The policy of taxing foreign miners was established by the Act of 1850, and nothing has been added to or subtracted from the act of that year, except in regard to the mere amount of the tax.  The Act of 1850 designates the mines of the public lands as the "mines of this State," and provides for the suspension of the law whenever Congress shall legislate for the control and direction of the lands for mining on which the foreigner is to be taxed.  And it is only because of the absence of Congressional legislation that the State presumes to impose the tax, and that the Court upholds its constitutionality.  (*People* v. *Naglee,* 1 Cal. 240.)  The great principle that runs through that case is, that neither corporations nor individuals can be interfered with in the

Ah Hee *v.* Crippen.

enjoyment of their lands, by the imposition of a special tax upon the lessee or worker thereof. With entire consistency, however, the Court decided that the objection must come from the owner or some party in privity with the owner.

FIELD, C. J. delivered the opinion of the Court—BALDWIN, J. and COPE, J. concurring.

The sixty-fourth section of the Revenue Act of 1860 declares that no person who is not a citizen of the United States, or who has not previously declared his intention to become such, (Californian Indians excepted) shall be allowed " to take gold from the mines of this State, or hold a mining claim therein," without a license as subsequently provided by the act. The plaintiff is a Chinaman, and, of course, is not a citizen of the United States, or entitled to become such under any existing legislation of Congress, and was engaged in mining upon the Mariposa estate, the property of Fremont and others, under a lease from the owners. The defendant is Sheriff of Mariposa county, and the property in controversy was seized by him in the enforcement of the license tax, claimed of the plaintiff under the section in question. The point for determination is, whether the section refers to mines contained in lands which are the private property of individuals, as well as to those in the public lands of the State, or of the United States. We are clearly of the opinion that it refers only to mines in the public lands. The owners of the Mariposa estate derive their title under a grant of the former Mexican Government and a patent from the United States issued upon its confirmation. That patent invested the patentee with the ownership of the precious metals which the land may contain. It transferred to him all interests which the United States possessed in the soil, and everything imbedded in or connected therewith. (*Moore* v. *Smaw*, and *Fremont* v. *Flower*, 17 Cal. 200.)

By force of this instrument, therefore, the owners possess whatever " mining claims " exist upon the estate, and their rights in that respect can neither be enlarged nor diminished by any license from the State. They hold such claims independent of the section in question, and may extract the gold themselves, or allow others to extract it, upon such terms as they may judge most advantageous to their interests.

Our conclusion as to the limitation which the general language of the section must receive, is strengthened by a consideration that a like limitation has uniformly been applied to language equally comprehensive in previous statutes. For example: the Act of 1850, "for the better regulation of the mines, and the government of foreign miners," in its first section declares that " no person who is not a native or natural born citizen of the United States, or who may not have become a citizen under the treaty of Guadalupe Hidalgo, (all native Californian Indians excepted) shall be permitted to *mine in any part of this State* without having first obtained a license " according to the provisions of the act. Yet, that the Legislature must have intended the prohibition against mining without a license, to apply only to mining on the public lands, notwithstanding the broad terms used, is evident from the fourteenth section of the same act. By that section, it is made the duty of the Governor, so soon as he shall be officially informed of the passage of a law by Congress assuming the control of the mines of the State, to issue his proclamation requiring all collectors of licenses to foreign miners to stop the issuing of licenses. The legislation thus anticipated plainly referred to the public lands which were subject to the disposition and control of Congress.

Judgment affirmed.